**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:26-cv-01515-DDD-CYC

UNITED STATES OF AMERICA,

      Plaintiff-Intervenor,

&

X.AI LLC,

      Plaintiff,

v.

PHILIP J. WEISER, Colorado Attorney General,

      Defendant.

---

**UNITED STATES OF AMERICA'S COMPLAINT IN INTERVENTION**

---

The United States of America brings this Complaint in Intervention for declaratory and injunctive relief under the Civil Rights Act of 1964, 42 U.S.C. § 2000h-2, and alleges:

**INTRODUCTION**

1. As Artificial Intelligence (AI) rapidly reshapes the global economy and dramatically impacts national security, one thing is clear: embedding AI with state-mandated discrimination is a recipe for disaster.

2. The term "AI" can encompass a wide range of technologies, including any machine that performs tasks that have been thought to require human intelligence. Until recently, computer systems primarily used rules-based software to codify the knowledge of human experts. In the past 15 years or so, many AI breakthroughs have occurred in the more sophisticated area of "machine learning." Rather than relying on the knowledge of human experts, machine learning systems run

1

on training datasets and produce models that allow the systems to effectively program themselves. Humans guide this process by building or identifying datasets, structuring models, setting guardrails and parameters, and identifying and fixing problems. But machine learning models need not rely on human knowledge to learn new things. These systems were once too cumbersome and expensive to be ubiquitous. But due to improvements in datasets, computing power, and software development, they have become more widespread. As a result, a vibrant AI ecosystem is transforming the national and global economy—plus national security technology and many other areas of American life. "United States leadership in [AI] will promote United States national and economic security across many domains." Exec. Order No. 14365, *Ensuring a National Policy Framework for Artificial Intelligence*, 90 Fed. Reg. 58,499 (Dec. 11, 2025).

3.        "The United States is in a race to achieve global dominance in artificial intelligence." Executive Office of the President of the United States, *Winning the Race, America's AI Action Plan* 1 (July 2025).[1] "Whoever has the largest AI ecosystem will set global AI standards and reap broad economic and military benefits." *Id.* "Just like we won the space race, it is imperative that the United States and its allies win this race." *Id.* "To win, United States AI companies must be free to innovate without cumbersome regulation." Exec. Order 14365, 90 Fed. Reg. at 58,499.

4.        Colorado's soon-to-take-effect AI law, Senate Bill 24-205 (SB24-205), jeopardizes the United States' position as the global AI leader by requiring AI systems to incorporate discriminatory ideology that prioritizes preferred demographic characteristics and outcomes over accurate and merit-based outputs. SB24-205 constrains the information that AI systems convey,

---

[1] *Available at* https://www.whitehouse.gov/wp-content/uploads/2025/07/Americas-AI-Action-Plan.pdf (last visited Apr. 23, 2026).

obligates AI developers and deployers to discriminate, and then enforces the state-mandated discrimination with onerous policy, assessment, and disclosure requirements that will disproportionately burden small businesses and start-ups. It is no surprise that even the Governor and Attorney General of Colorado repeatedly have recognized that SB24-205 is deeply misguided. But it is not just misguided—it is also unconstitutional. SB24-205 flouts the Equal Protection Clause of the United States Constitution, and cannot stand.

5.      Under the guise of preventing "algorithmic discrimination," SB24-205 requires developers and deployers of AI systems to take steps to prevent even the *risk* of "differential treatment or impact" on a wide range of groups that Colorado deems protected—even if systems are based on neutral and relevant criteria.

6.      Although SB24-205 purports to prevent only "unlawful" differential impact, it treats statistical disparities as evidence of discrimination, and then requires racial (or other protected characteristic) demographic balancing to avoid an enforcement action. SB24-205 fosters further discrimination by expressly exempting from regulation the offer, license, or use of AI "to increase diversity or redress historical discrimination."

7.      SB24-205 violates the Equal Protection Clause of the Fourteenth Amendment. It distorts AI model outputs in a manner that effectively requires developers and deployers to discriminate based on race, sex, religion, and other protected characteristics.[2] To avoid even a risk of differential treatment (other than the sort that Colorado approves) when systems use neutral criteria to convey information, regulated entities are coerced to alter outputs based on demographics. But "if the . . . Government is prohibited from discriminating on the basis of race, . . . then surely it is also prohibited from enacting laws mandating that third parties . . . discriminate

---

[2] References herein to "race" encompass race, color, or national origin.

on the basis of race." *See Ricci v. DeStefano*, 557 U.S. 557, 594 (2009) (Scalia, J., concurring) (citing *Buchanan v. Warley*, 245 U.S. 60, 78-82 (1917)). This logic extends to discrimination on the basis of sex and religion, which the Equal Protection Clause likewise forbids. Because SB24-205 "compel[s] persons to discriminate against other persons because of race," sex, and religion, it is "a palpable violation of the Fourteenth Amendment." *See Peterson v. City of Greenville*, 373 U.S. 244, 248 (1963).

8.     SB24-205's savings clause (which merely disclaims any conflict with federal law) does not cure its constitutional woes. SB24-205's entire discrimination regime violates federal law and permeates the statute.

9.     The Equal Protection Clause precludes Colorado's attempt to force discriminatory ideology on the AI industry. The Court should declare SB24-205 unconstitutional and enjoin its implementation and enforcement.

10.     While this Complaint is focused on the Equal Protection Clause because of the United States' special statutory responsibility to vindicate those rights through intervention, SB24-205 is unconstitutional in other ways too. For example, by requiring AI developers and deployers to mitigate the risk of "algorithmic discrimination," SB24-205 compels them to accommodate particular messages, censors their speech based on its content, and chills their speech. To comply with SB24-205, developers and deployers must make different editorial decisions regarding training data, responses to prompts, model constraints, and more—all to generate Colorado's preferred expressive outputs. And by authorizing outputs that would otherwise qualify as "algorithmic discrimination" if the developer or deployer's purpose is increasing diversity or addressing historical discrimination, SB24-205 expressly discriminates based on viewpoint.

11.     Colorado officials—including the Governor and Attorney General—have

4

acknowledged that SB24-205 will stifle innovation and drive business from Colorado, and they have called for revisions to the statute. Nonetheless, SB24-205 takes effect in June 2026, and is already impacting regulated entities nationwide. As the Acting Attorney General of the United States has certified, this is a matter of general public importance. The United States therefore brings this Complaint in Intervention to safeguard the rights and interests that SB24-205 infringes.

## JURISDICTION AND VENUE

12.     The Court has jurisdiction under 28 U.S.C. §§ 1331, 1345, and 42 U.S.C. § 2000h-2.

13.     Venue is proper in this jurisdiction because the acts and omissions that form the basis for this Complaint occurred within this judicial district. *See* 28 U.S.C. § 1391(b)(2).

14.     The Court has authority to provide the requested relief under 28 U.S.C. §§ 1651, 2201, and 2202.

## PARTIES

15.     Based on information and belief, the United States incorporates Paragraphs 17-24 of Plaintiff X.AI LLC's (xAI) Complaint (Dkt. 1) regarding the plaintiff to this action.

16.     Plaintiff-Intervenor is the United States of America. The United States suffers a legal injury when a state violates federal law, including the United States Constitution. *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000). The United States has standing to vindicate the public interest in obedience to federal law and has a statutory right to intervene when "an action has been commenced . . . seeking relief from the denial of equal protection of the laws under the fourteenth amendment." 42 U.S.C. § 2000h-2; *see Pasadena City Bd. of Educ. v. Spangler*, 427 U.S. 424, 430-31 (1976). The United States may also sue as *parens patriae* to secure the federal rights of its citizens. *Massachusetts v. Mellon*, 262 U.S. 447, 485-86

(1923).

17.    The United States is authorized to intervene in this action pursuant to 42 U.S.C. § 2000h-2 because xAI seeks relief from the denial of equal protection of the laws under the Fourteenth Amendment (Dkt. 1 ¶¶ 187-201), and the Acting Attorney General of the United States has certified that this case is of general public importance. *See* 42 U.S.C. § 2000h-2; Ex. A.

18.    Defendant Philip Weiser is the Attorney General of Colorado and is responsible for enforcing SB24-205. *See* Colo. Rev. Stat. §§ 6-1-1706(1), (6), 6-1-1707(1).[3]  He is sued in his official capacity.

## BACKGROUND

19.    In May 2024, Governor Jared Polis signed into law SB24-205, "Consumer Protections for Artificial Intelligence," which regulates AI "developers" and "deployers" to prevent "algorithmic discrimination." *See* § 6-1-1701 *et seq.* SB24-205 takes effect on June 30, 2026.

20.    "Algorithmic discrimination" is defined to mean "any condition in which the use of an artificial intelligence system results in an unlawful differential treatment or impact that disfavors an individual or group of individuals on the basis of their actual or perceived age, color, disability, ethnicity, genetic information, limited proficiency in the English language, national origin, race, religion, reproductive health, sex, veteran status, or other classification protected under the laws of [Colorado] or federal law." § 6-1-1701(1)(a).

21.    However, "algorithmic discrimination" expressly does not include the "offer, license, or use" of an AI system "for the sole purpose of . . . [e]xpanding an applicant, customer, or participant pool to *increase diversity or redress historical discrimination*." § 6-1-

---

[3] Unless specified otherwise, statutory citations refer to the Colorado Revised Statutes.

1701(1)(b)(I)(B) (emphasis added).

22.       A "developer" is "a person doing business in [Colorado] that develops or intentionally and substantially modifies an artificial intelligence system." § 6-1-1701(7). A "deployer" is "a person doing business in [Colorado]" that "uses[s] a high-risk artificial intelligence system." §§ 6-1-1701(5), (6).

## A. Developers' Duties

23.       SB24-205 imposes two distinct duties on developers: (1) a duty to take reasonable care to avoid algorithmic discrimination, and (2) disclosure duties.

### 1. Duty to Avoid Algorithmic Discrimination

24.        SB24-205 requires "a developer of a high-risk artificial intelligence system" to "use reasonable care to protect consumers from any known or reasonably foreseeable risks of algorithmic discrimination arising from the intended and contracted uses of the high-risk artificial intelligence system." § 6-1-1702(1).

25.       Put otherwise, a developer must use reasonable care to prevent any foreseeable risk that its AI system could contribute to a decision that could disfavor consumers based on characteristics that Colorado has identified as protected (from race to ability to speak English), unless such disfavored treatment is for the purpose of increasing diversity or addressing historical discrimination.

26.       "Artificial intelligence system" means "any machine-based system that, for any explicit or implicit objective, infers from the inputs the system receives how to generate outputs, including content, decisions, predictions, or recommendations, that can influence physical or virtual environments." § 6-1-1701(2).

27.        "High-risk artificial intelligence system" means "any artificial intelligence system

7

that, when deployed, makes, or is a substantial factor in making, a consequential decision." § 6-1-1701(9)(a).

28.     "Substantial factor" means a factor that (1) assists in making a consequential decision; (2) is capable of altering the outcome of a consequential decision; and (3) is generated by an artificial intelligence system. § 6-1-1701(11)(a). It "includes *any* use of an artificial intelligence system to generate *any* content, decision, prediction, or recommendation concerning a consumer that is used as *a* basis to make a consequential decision concerning the consumer." § 6-1-1701(11)(b) (emphasis added).

29.     "Consequential decision" means "a decision that has a material legal or similarly significant effect on the provision or denial to any consumer of, or the cost or terms of": (1) education enrollment or an education opportunity; (2) employment or an employment opportunity; (3) a financial or lending service; (4) an essential government service; (5) healthcare services; (6) housing; (7) insurance; or (8) a legal service. § 6-1-1701(3).

30.     The "High Risk artificial intelligence system" definition excludes a system "intended to . . . [p]erform a narrow procedural task" or a system that is intended to "[d]etect decision-making patterns or deviations from prior decision-making patterns and is not intended to replace or influence a previously completed human assessment without sufficient human review." § 6-1-1701(9)(b)(I).[4]

---

[4] The statute also contains a seemingly superfluous exclusion for certain technologies—such as anti-fraud technology, calculators, data storage, spreadsheets, and "[t]echnology that communicates with consumers in natural language for the purpose of providing users with information, making referrals or recommendations, and answering questions and is subject to an accepted use policy that prohibits generating content that is discriminatory or harmful"—"unless the technologies, when deployed, make, or are a substantial factor in making, a consequential decision." § 6-1-1701(9)(b)(II). Because the definition of "high-risk artificial intelligence system" already requires a consequential-decision nexus, *see* § 6-1-1701(9)(a), it is unclear what purpose this purported carve-out serves.

31.       "Consumer" means "an individual who is a Colorado resident."  § 6-1-1701(4).

### 2. Disclosure Duties

32.       In addition to imposing an enforceable duty of care, § 6-1-1702 imposes various disclosure requirements on developers.

33.       For example, a developer must "disclose to the [Colorado] attorney general, in a form and manner prescribed by the attorney general, and to all known deployers or other developers of the high-risk artificial intelligence system, any known or reasonably foreseeable risks of algorithmic discrimination arising from the intended uses of the high-risk artificial intelligence system without unreasonable delay."  § 6-1-1702(5).

34.       A developer must also "make available to the deployer or other developer of the high-risk artificial intelligence system" a laundry list of other information. § 6-1-1702(2). This information includes: (1) a statement "describing the reasonably foreseeable uses and known harmful or inappropriate uses" of the AI system; and (2) documentation disclosing or describing (a) the type of data used to train the system, (b) "known or reasonably foreseeable risks of algorithmic discrimination arising from the intended uses" of the AI system, (c) measures "taken to mitigate known or reasonably foreseeable risks of algorithmic discrimination" that could result from an AI system's "reasonably foreseeable deployment," (d) the AI system's "purpose" and "intended benefits," (e) how the AI system "was evaluated for . . . mitigation of algorithmic discrimination" before it was "made available," (f) "measures used to examine the suitability of data sources, possible biases, and appropriate mitigation," and (g) any information "reasonably necessary to assist the deployer in . . . monitor[ing] the performance of the . . . [AI] system for risks of algorithmic discrimination."  § 6-1-1702(2).

## B. Deployers' Duties

35.    Unlike developers, deployers' duties under SB24-205 are not limited to the duty to avoid algorithmic discrimination and disclosure duties. SB24-205 also requires deployers to adopt policies and perform assessments, with corresponding recordkeeping and disclosure requirements.

### 1. Duty to Avoid Algorithmic Discrimination

36.    As with developers, SB24-205 obligates deployers to "use reasonable care to protect consumers from any known or reasonably foreseeable risks of algorithmic discrimination." § 6-1-1703(1).

### 2. Risk Management Policy Duties

37.    A deployer must "implement a risk management policy and program" that "must specify and incorporate the principles, processes, and personnel that the deployer uses to identify, document, and mitigate known or reasonably foreseeable risks of algorithmic discrimination." § 6-1-1703(2)(a). "The risk management policy and program must be an iterative process planned, implemented and regularly and systematically reviewed and updated[.]" *Id.* And the risk management policy "must be reasonable" considering various enumerated factors. *Id.*

### 3. Assessment Duties

38.    At least annually, and within ninety days "after any intentional and substantial modification" to an AI system, a deployer (or third party contracted by the deployer) must "complete an impact assessment" for the AI system that includes, *inter alia*, an analysis of whether deployment of the AI system "poses any known or reasonably foreseeable risks of algorithmic discrimination and, if so, the nature of the algorithmic discrimination and the steps that have been taken to mitigate the risks." § 6-1-1703(3)(a)-(b)(II).

39.    Also on an annual basis, a "deployer, or a third party contracted by the deployer,

10

must review the deployment of each high-risk artificial intelligence system deployed by the deployer to ensure that the high-risk artificial intelligence system is not causing algorithmic discrimination." § 6-1-1703(g).

40.    Thus, SB24-205 coerces deployers to engage in demographic-conscious use of AI. SB24-205 obligates deployers to monitor real-world outputs, assess the "risk" of unlawful differential treatment, and take corrective action in ongoing use—without any judicial finding of unlawfulness. When outputs inevitably include disparities, deployers facing liability are pressured to adjust their AI systems to eliminate the disparities, and demographic calibration becomes the standard for compliance.

### 4. Disclosure Duties

41.    If a deployer "discovers that the high-risk artificial intelligence system [it deployed] has caused algorithmic discrimination, the deployer, without unreasonable delay, but no later than ninety days after the date of the discovery, shall send to the [Colorado] attorney general . . . a notice disclosing the discovery." § 6-1-1703(7).

42.    The Colorado Attorney General may demand disclosure of the risk management policy, impact assessment, and/or records maintained pursuant to a deployer's statutory duties. § 6-1-1703(9).

43.    Deployers must also "make available, in a manner that is clear and readily available on the deployer's website, a statement summarizing," among other information, "[h]ow the deployer manages known or reasonably foreseeable risks of algorithmic discrimination that may arise from the deployment of each high-risk artificial intelligence system." § 6-1-1703(5)(a)(II). The deployer must "periodically update" this statement. § 6-1-1703(5)(b).

44.    Deployers must also provide consumers with notice and detailed information

whenever it "deploys a high-risk artificial intelligence system to make, or be a substantial factor in making, a consequential decision concerning a consumer." § 6-1-1703(4)(a).

45.     There are limited exceptions to these policy, assessment, and disclosure requirements. The consumer notice requirements apply to all deployers. *See* § 6-1-1703(6). By contrast, the risk management policy, impact assessment, and website disclosure requirements do not apply to certain deployers with fewer than fifty employees who satisfy various requirements, including making available an impact assessment that the developer of the AI system has provided to the deployer. *See id.*

## CLAIMS FOR RELIEF

### COUNT ONE
### Violation of the Equal Protection Clause of the
### Fourteenth Amendment: Compelled Discrimination
### (42 U.S.C. § 2000h-2)

46.     The United States incorporates paragraphs 1-45 of the Complaint as if stated herein.

47.     Under the Equal Protection Clause of the Fourteenth Amendment, "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV. When a state law "compel[s] persons to discriminate against other persons because of race," it is "a palpable violation of the Fourteenth Amendment." *Peterson v. City of Greenville*, 373 U.S. 244, 248 (1963). Indeed, "if the . . . Government is prohibited from discriminating on the basis of race, . . . then surely it is also prohibited from enacting laws mandating that third parties . . . discriminate on the basis of race." *See Ricci v. DeStefano*, 557 U.S. 557, 594 (2009) (Scalia, J., concurring) (citing *Buchanan v. Warley*, 245 U.S. 60, 78-82 (1917)). This logic extends to discrimination on the basis of sex and religion, which the Equal Protection Clause likewise forbids.

48.     SB24-205 violates the Equal Protection Clause because it compels AI developers and deployers to discriminate based on race, sex, religion, or other protected characteristics. By

requiring developers and deployers to prevent the "risk" of disparate outcomes based on demographic characteristics, SB24-205 effectively requires developers and deployers to expressly use demographic characteristics, including race, sex, and religion when building and using algorithmic models.

49.    SB24-205 imposes liability for "algorithmic discrimination" based on statistics alone. The statute defines "algorithmic discrimination" as including any use of an AI system that "results in an unlawful differential treatment or impact that disfavors an individual or group of individuals on the basis of their actual or perceived . . . race, religion, . . . [or] sex" § 61-1-1701(1)(a). In other words, the statute imposes liability simply because the algorithm can result in a statistically disparate impact based on race, sex, religion, or other protected characteristic—even if AI developers and deployers are not intentionally discriminating (or even are aware of the disparate impact).

50.    To avoid this disparate-impact liability, a developer or deployer must analyze the results of an algorithm that can be used for limitless purposes within the fields of education, employment, financial services, government services, healthcare, housing, insurance, and legal services. § 6-1-1701(3). The developer or deployer then must determine whether a disparate impact exists and attempt to correct the disparate impact via racial (or other protected-class-based) engineering.

51.    For example, if an algorithm used by employers to screen job applicants inadvertently disadvantages white Americans by primarily selecting applicants who are from minority zip codes or who have names that are more common for minorities, a developer or deployer must alter the algorithm to eliminate the unintentional disparate impact. Stated differently, the developer or deployer must recalibrate the algorithm to be more favorable to white

Americans. The same is true for an algorithm that selects student admissions, financial lending, and several other categories enumerated in SB24-205. § 6-1-1701(3). In "zero-sum" games such as hiring and student admissions, the intentional creation of a white-friendly algorithm necessarily entails intentionally creating an algorithm that discriminates against non-whites. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 218-19 (2023) (*SFFA*).

52.    The Equal Protection Clause prohibits states from compelling private actors to discriminate on the basis of race, sex, and religion. SB24-205 therefore violates the Equal Protection Clause by compelling developers and deployers to discriminate on the basis of race, sex, and religion to "correct" statistically disparate impacts.

53.    It is impossible to sever SB24-205's unlawful duties, which consist of disclosure requirements and enforcement provisions concerning the discrimination duties.

**COUNT TWO**
**Violation of the Equal Protection Clause of the**
**Fourteenth Amendment: Authorized Discrimination**
**(42 U.S.C. § 2000h-2)**

54.    The United States incorporates paragraphs 1-53 of the Complaint as if stated herein.

55.    SB24-205 does not just compel developers and deployers to discriminate on the basis of race, sex, religion, and other protected characteristics to avoid unintentional differential treatment. It also expressly authorizes *intentional* differential treatment in two circumstances.

56.    First, SB24-205 authorizes developers and deployers to engage in what would otherwise be illegal "algorithmic discrimination" if the purpose is "to increase diversity" (whatever that means). § 6-1-1701(1)(b)(I)(B). In other words, liability under SB24-205 depends on *which* race, sex, religion, or other protected characteristic, is impacted. That violates the Equal Protection Clause.

14

57.      Second, SB24-205 excepts from the definition of "algorithmic discrimination" the offer, license, or use of AI to "redress historical discrimination." § 6-1-1701(1)(b)(I)(B).

58.      The Equal Protection Clause allows "only two compelling interests that permit resort to race-based government action. One is remediating specific, identified instances of past discrimination that violated the Constitution or a statute. The second is avoiding imminent and serious risks to human safety in prisons, such as a race riot." *SFFA*, 600 U.S. at 207 (citations omitted).

59.      The Equal Protection Clause does not give states unlimited authority to remedy past discrimination. A state may draw so-called remedial racial classifications only if it can provide "evidence of past discrimination" by the state or private actors in the relevant area against the groups favored by the remedial classifications. *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 506 (1989) (emphasis omitted). Such evidence generally must show "past intentional discrimination" by the state. *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007). "A generalized assertion of past discrimination … is not adequate[.]" *Shaw v. Hunt*, 517 U.S. 899, 909 (1996).  Neither are "statistical generalizations." *See J.A. Croson*, 488 U.S. at 499.

60.      And while discrimination on the basis of sex receives less scrutiny than discrimination on the basis of race and religion, the state's proffered justification for such discrimination must still be "exceedingly persuasive." *United States v. Virginia*, 518 U.S. 515, 533 (1996). The state "must show at least that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Id.* (quotation marks and citation omitted).

61.      SB24-205's authorization of intentional differential treatment to remedy historical

15

discrimination does not reflect a compelling interest (as required to satisfy strict scrutiny for race- or religious-based discrimination) or an exceedingly persuasive important governmental objective (as required to satisfy intermediate scrutiny for sex-based discrimination).

62.     There is no evidence of past intentional discrimination by Colorado or by private algorithmic developers or deployers in the nascent industry of AI. Thus, Colorado's efforts to prevent discrimination against "groups that, as a practical matter, may never have suffered from discrimination" in AI, "suggests that perhaps [its] purpose was not in fact to remedy past discrimination." *J.A. Croson*, 488 U.S. at 506.

63.     Even if Colorado had a sufficient interest to warrant intentional differential treatment, SB24-205 (which, paradoxically, requires more discrimination) is neither adequately tailored, nor substantially related, to such an interest. As noted, it is radically overbroad. Less restrictive alternatives, including Federal and state civil rights laws, already serve any cognizable state interests. For these reasons, SB24-205 fails both strict and intermediate scrutiny.

**PRAYER FOR RELIEF**

WHEREFORE, the United States respectfully requests that this Court grant the following relief:

1.   Enter a judgment declaring that SB24-205 violates the Equal Protection Clause of the Fourteenth Amendment and is therefore invalid.

2.   Issue a preliminary and permanent injunction that prohibits Defendant and his successors, agents, and employees, from enforcing SB24-205.

3.   Award any other relief that the Court deems just and proper.

DATED: April 24, 2026                          Respectfully submitted,

BRETT A. SHUMATE                          HARMEET K. DHILLON
Assistant Attorney General                   Assistant Attorney General

YAAKOV M. ROTH                            JESUS A. OSETE
Principal Deputy Assistant Attorney General   Principal Deputy Assistant Attorney General

CHARLES E.T. ROBERTS                      ERIC SELL
Counsel to the Assistant Attorney General    Deputy Assistant Attorney General

                                          s/ Greta Gieseke
Alexandra McTague Schulte                  **_Greta Gieseke_**
Senior Litigation Counsel                   Joshua R. Zuckerman
Enforcement & Affirmative Litigation Branch  Attorneys
Civil Division                             Civil Rights Division
U.S. Department of Justice                  U.S. Department of Justice
450 5th St. NW                             950 Pennsylvania Ave. NW
Washington, DC 20001                       Washington, DC 20530
Telephone: (202) 718-0483                   Telephone: (202) 514-3847
Email: Alexandra.McTague2@usdoj.gov         Email: Greta.Gieseke@usdoj.gov

                                          ATTORNEYS FOR PLAINTIFF-INTERVENOR
                                          UNITED STATES OF AMERICA

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.: 1:26-cv-01515

X.AI LLC,

       Plaintiff,

v.

PHILIP J. WEISER, COLORADO ATTORNEY GENERAL,

       Defendant.

---

### CERTIFICATE OF THE ACTING ATTORNEY GENERAL

---

I, Todd Blanche, Acting Attorney General of the United States, hereby certify pursuant to

42 U.S.C. § 2000h-2 that the above-captioned case is of general public importance.

Signed this _24th_ day of April 2026 in Washington, D.C.

_____

TODD BLANCHE
Acting Attorney General of the United States